UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 19-402 JGB (SHKx)** | Date | September 11, 2020 |
| Title | *Tisha Entz v. Standard Insurance Company* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   **FINDINGS OF FACT AND CONCLUSIONS OF LAW (IN CHAMBERS)**

A bench trial was scheduled to commence on July 13, 2020. This Employment Retirement Income Security Act ("ERISA") action concerns the denial of Tisha Entz's ("Plaintiff") long-term disability ("LTD") benefits pursuant to Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1), (3). Plaintiff seeks recovery of long-term disability benefits under an ERISA-governed benefit plan ("Plan"), established by the California Teachers Association Economic Benefit Trust. Standard Insurance Company ("Defendant") operates as the administrator of claims made under the Plan.

On March 24, 2020, the parties each filed trial briefs. ("Plaintiff's Brief," Dkt. No. 40; "Defendant's Brief," Dkt. No. 41.) On April 7, 2020, the parties each filed responsive trial briefs. ("Plaintiff's Reply," Dkt. No. 43; "Defendant's Reply," Dkt. No. 42.) The parties agreed that no witnesses were to be called and the Court granted their stipulation to vacate the pretrial conference and trial dates, and to proceed only with oral argument. (Dkt. No. 51.) Upon reviewing the arties' trial briefs and the Administrative Record, ("AR," Dkt. Nos. 36-39), the Court determines that argument is unnecessary for decision on this matter.

**I.   FINDINGS OF FACT[1]**

---

[1] The Court has elected to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions, which aids appellate review and provides the parties with more satisfying explanations. Any finding of fact that constitutes a

"In bench trials, Fed. R. Civ. P. 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" Vance v. American Hawaii Cruises, Inc., 789 F.2d 790, 792 (9th Cir. 1986) (quoting Fed. R. Civ. P. 52(a)). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision. This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." Id. (citations omitted). The following constitutes the findings of fact based on the Administrative Record.

**A. Employment History**

Starting in 1997, Plaintiff worked as a classroom teacher for Victor Elementary School in Victorville, California, and participated in LTD coverage through the California Teachers Association. (AR at 813.) Plaintiff worked in school year 2014-2015. (Id. at 150.) She exhausted her sick leave by the end of the 2014-2015 school year and her last day of work was June 10, 2015. (Id. at 841.) Plaintiff did not return to her teaching position at the start of the 2015-2016 school year. (Id. at 150, 156.) Her first asserted day of absence as a result of disability was August 14, 2015. (Id. at 841.)

**B. Plan Terms**

Defendant Standard Insurance Company ("Standard") issued its Group Disability Insurance Policy No. 501000-M ("the Plan") to the California Teachers Association Economic Benefits Trust ("the Trust"), as policyholder. (AR at 1083.) The Trust provided long term disability ("LTD") benefits, funded by the Policy, to eligible individuals including certain members of the California Teachers Association. (Id.) Terms and conditions of the Trust's LTD coverage are set forth in the Plan. (Id. at 910-1153.)

   **1. Timeliness of Notice, Suit**

A claimant must give written notice of the claim within 60 days after the beginning of a loss, or as soon as reasonably possible. (AR at 1112.) "Disability Benefits will be paid . . . at the end of each month upon receipt of due written proof of loss." (Id. at 1112.)

The Plan provides that suit may not be brought "after the expiration of three years after the time proof of loss is required to be furnished." (AR at 1116.) Proof of loss means "proof covering the occurrence, the character and the extent of the loss for which claim is made." (Id. at 1112.) If the claim is one for periodic payments contingent on continuing disability, proof of loss must be provided "within 90 days of the end of the period for which [the claimant asserts that Standard] is liable," unless "it was not reasonably possible to give proof of loss within such

---

conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

time." (Id. at 1112.) In case of a claim for any other loss, proof of loss must be provided "within 90 days after the date of such loss." (Id.)

### 2. Definition of Disability

The Plan pays a benefit for "disability," subject to all Plan terms and conditions. (Id. at 1097.) The Plan includes several definitions of disability. Plaintiff argues she satisfies the "Total Disability" from "Usual Occupation" definition:

> A. Usual Occupation Definition of Disability
>
> During the Benefit Waiting Period and the Usual Occupation Period you are required to be Totally Disabled from your Usual Occupation . . .
>
> 1. Total Disability Definition: You are Totally disabled from your Usual Occupation if, as a result of Sickness or Injury you are unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue your Usual Occupation and you are not working in your Usual Occupation . . . .
>
> Usual Occupation may be interpreted to mean the employment, business, trade or profession that involves the Substantial And Material Acts of the occupation you are regularly performing for your Employer when Disability begins. Usual Occupation is not necessarily limited to the specific job you perform for your Employer.
>
> Substantial And Material Acts means the important tasks, functions and operations generally required by employers from those engaged in your Usual Occupation that cannot be reasonably omitted or modified. In determining what Substantial And Material Acts are necessary to pursue your Usual Occupation, we will first look at the specific duties required by your job. If you are unable to perform one or more of these duties with reasonable continuity, we will then determine whether those duties are customarily required of other individuals engaged in your Usual Occupation. If any specific, material duties required of you by your job differ from the material duties customarily required of other individuals engaged in your Usual Occupation, then we will not consider those duties in determining what Substantial And Material Acts are necessary to pursue your Usual Occupation.

(Id. at 917, 1097.) "Sickness" is defined as "an illness or disease, a Mental Disorder, a pregnancy, or the donation of your kidney, skin, lung, or bone marrow for transplantation into another person." (Id. at 1123.)

### C. Plaintiff's Medical History

Plaintiff had heart surgery in 1997, (id. at 272-73), and donated a kidney to her father the same year, (id. at 482). In 2006 her gallbladder was removed, (id. at 274), and she had a spinal discectomy (disc replacement and fusion to address degeneration and pain) in 2007, (id. at 222-23, 465, 502). She had an endoscopy and biopsies for abdominal pain in 2010, with benign results, (id. at 275). Entz was diagnosed with a deep vein thrombosis (DVT) during a pregnancy, and experienced symptoms of pain and swelling in her leg thereafter, (id. at 286, 619 (despite no finding of DVT later)), and had varicose vein surgery in March 2010, (id. at 465).

In late 2013 to early 2014, Entz stated she felt ill and experienced severe weakness. (Id. at 150.) In early 2014, plaintiff told her primary care physician, Dr. Suzanne Rizkalla, that she had Lyme disease. (Id. at 710-11.) Plaintiff reported "fatigue, headache, muscle cramping, night sweats, palpitations, and rash" in April 2014. (Id. at 748.) Dr. Rizkalla observed Plaintiff "[f]eels weak, looks ill . . . Multiple red maculopapular rash scattered on the trunk and the upper extre[mity.] Assessment: Skin rash possible Lyme disease, anemia, dementia, lumbar disc disease." (Id.) Plaintiff also told Dr. Rizkalla in April 2014 that she had been having slurred speech, memory loss and cognitive problems. (Id. at 748) (referral for brain MRI/MRA). A brain MRI on May 20, 2014, however, yielded "normal" results. (Id. at 266, 502, 714.)

Plaintiff saw Dr. Rizkalla on June 2, 2014 and complained of "fatigue headaches, [and] generalized aches." (Id. at 742.) Assessment was "possible lyms [sic] disease, hypothyroidism, [and] ankle edema.] (Id. at 742.) Labs subsequently ordered by Dr. Rizkalla were negative for Lyme, though the report noted that a "negative result does not exclude infection with Borrelia burgdorferi," and that serologic testing may be indicated. (Id. at 710.)

On June 12, 2014, Entz was seen by Yvonne Sorenson—a certified physician's assistant in Dr. Steven Harris' office—for evaluation of possible Lyme. (Id. at 482-83.) She noted: "1-2 years ago, more slurring in speech, misspeaking. Worse this year. More obvious as [patient] is a teacher. . . Constant burning under skin . . . Significant decrease if [patient] on doxycycline. Constant nausea. Irritability. Energy horrible. . . Night sweats . . . Palpitations. Irritable bowel. . . Muscle and joint pain L> R. Hands and feet cramp. Brain fog. Not processing information the same way. . . Top Complaints: extreme fatigue, all over pain/tingling/numbness." (Id. at 483.) The reason for consultation states, "[patient] comes in for evaluation of possible Lyme." (Id. at 782.) Lab results dated June 12, 2014 noted high values for HHV-6, a strain of the human herpesvirus that can cause diarrhea and rash and that has been linked to chronic fatigue syndrome. (Id. at 161-62.) On July 7, 2014 the PAC noted Plaintiff was tolerating clarithromycin (an antibiotic) "ok" and had been taking it "1-2 weeks. Not feeling good. Needing to rest a lot. Getting a lot of cramps." (Id. at 481.)

Only July 1, 2014, Plaintiff returned to Dr. Rizkalla to follow up on lab tests, and the Doctor again explained that lab results were negative for Lyme disease, but positive for lupus

anticoagulant.[2]  (Id. 498.)  Rizkalla referred Plaintiff to rheumatology to evaluate possible autoimmune disease.  (Id.)

In August 2014 Dr. Harris added multiple antibiotics to Plaintiff's drug regimen.  (Id. at 780.)  Plaintiff later explained to a Standard claim analyst that in January 2014, about 18 months before she submitted her LTD claim, she "started doing research on the internet and met someone that had lyme [sic] disease which started to make sense. [Plaintiff] was tested and it came back that she has lyme [sic] disease and so do her children. . . . She said she was in treatment all last year and it really made her worse.  Her body has been storing all of the toxins and so they are trying to reverse that.  [Plaintiff] said she has been on IV antibiotics since May [2015].  She takes detox baths and does detox enemas.  She is also eating foods to cleanse her intestines."  (Id. at 19-20.)

In November 2014 Plaintiff underwent a minor surgical procedure by Dr. Sam Siddighi, for complaints of painful sexual intercourse, "numbness and tingling" of an unspecified type, and "change of life."  (Id. at 521 (Plaintiff's letter to Standard in December 2015, saying that the November 2014 surgery was successful although "bladder control and other symptoms were not completely resolved").)  After the surgery Plaintiff had: "1: Cystoscopy with biopsies; 2. Hydrodistention; 3. Chemo denervation of pelvic muscles."  (Id. at 523)  Her pre- and post-operative diagnoses were chronic pelvic pain and Lyme disease.  (Id. at 523-24 (noting bowel incontinence).)  One year later, in November 2015, Dr. Siddighi noted Plaintiff was experiencing "chronic pelvic pain and frequent urination and [that] is affecting her ability to work."  (Id. at 522, 527.)

When plaintiff returned to Dr. Harris in December 2014, he assessed "possible co-infections despite negative test."  (Id. 778.)  He prescribed new antibiotics, and more supplements.  (Id.)

In February 2015, Plaintiff consulted Dr. Ramon Issa for complaints of left leg swelling and pain she said had caused falls, and said she thought she had deep vein thrombosis ("DVT"). (Id. at 614, 618.)  Dr. Issa noted trace swelling in left lower leg, redness, and tenderness to palpitation of the calf muscle.  (Id. at 251.)  A test dated February 17, 2015 notes venous reflux (reversal of blood flow often while standing or sitting), in veins in the left leg.  (Id. at 250.) Vascular support surgeon Dr. Zamzam advised that venous disease was "minimal," and recommended support hose.  (Id. at 251-52.)  Dr. Zamzam advised in April 2015 that Plaintiff's left leg and knee pain was not likely caused by venous disease, but she should proceed with a planned knee surgery.  (Id. at 258.)  Dr. Zamzam noted "her swelling likely will not markedly improve and her pain will likely persist."  (Id.)

---

[2] Lupus anticoagulant is a blood clotting disorder that can cause blood vessels to narrow and clots to form, leading to heart attacks and deep vein thrombosis. (Dkt. No. 46 ¶ 12 (citing University of Rochester Medical Center Encyclopedia).)

On March 30, 2015 Plaintiff had X-rays for complaints of spinal pain, which found mild degenerative disc disease and otherwise "normal" results. (Id. at 219.) She had a thoracic spine MRI the same day, with "normal" results other than "stable benign osseous hemangiomas." (Id. at 217.) On April 1, 2015 Plaintiff met with Dr. Wayne Cheng, an orthopedist, to discuss the results of her X-rays and thoracic spine MRI. He diagnosed spondylosis, and noted a complaint of numbness and tingling of the skin. (Id. at 218.) His notes show a referral for a rheumatology consult for the reported Lyme disease. (Id.)

On April 15, 2015, Plaintiff complained to Dr. Harris of a "feeling of poison running through [her] body" and "migrating numbness." (Id. at 776.) Dr. Harris noted she "goes home and goes to bed after work every day," (id. 476), and his assessment was Lyme disease, "likely co-infections" and unspecified "viral overload." (Id. at 776.) The regimen of supplements and antibiotics was changed, and plaintiff was instructed to take 3,000 mg. of vitamin C daily plus "detox and drainage iteres" twice a day. (Id. at 776)

On May 19, 2015, Dr. Rizkalla noted complaints of malaise, fatigue, and weakness, along with joint pain and myalgia. (Id. at 601-04.) Her assessment and plan noted "Lyme disease on IV Rocephin," and "PICC line is order." (Id.) A PICC line was placed on May 19, 2015. (Id. at 605.) On May 27, 2015, Dr. Rizkalla noted that "[Entz] is currently under treatment and will be unable to return to work: '[patient] off since 5-19-2015 through 5-21-2015.'" (Id. at 747.)

On May 27, 2015 Dr. Cheng signed a note saying, "It is my medical opinion that Tisha Entz has chronic pain, Lyme disease & is not a suitable candidate for gainful employment." (Id. at 507.) The note was found among documents plaintiff submitted for her appeal. (Dkt. No. 45-1 ¶ 34.)

On May 28, 2015 Plaintiff had been on intravenous antibiotics, via a PICC line, for three weeks. Dr. Harris noted "1 more week of work, then disability. Feeling like once she stops working can handle better." (AR at 775.) Antibiotic dosages were changed, and she was instructed regarding the coffee enemas and charcoal detoxing. (Id. at 775.)

Plaintiff had left knee surgery to repair a medial meniscal tear on June 19, 2015, and recuperated. (Id. at 220, 514.) After an emergency room referral in response to chest pain, doctors performed a cardiac CT/angiogram on June 30, 2015, which was unremarkable except for "nonspecific punctate focal calcification and a metallic fragment noted in the left lung base." (Id. at 263, 597.) The chest pain was noted "since [PICC] line insertion 5-6 weeks ago," (id. at 645), and a Dr. Yi Liu noted "tachycardia," (id. 590).

On July 1, 2015, after complaining of spinal pain, Plaintiff had a whole-body bone scan which was normal other than "mild" degenerative changes in her left knee and right heel. (Id. at 515.) On July 6, 2015, Plaintiff presented with hoarseness and weak voice. (Id. at 551-54 (noting evidence of laryngopharyngeal reflux).) On July 15, 2015, Plaintiff told cardiologist Dr. Mohammad Amini that her heart was "all over the place" and she "feels fluttering and her hand held device does not show a pulse." (Id. at 259.) A stress echocardiogram on August 25, 2015

was unremarkable. (Id. at 260.) Abnormal labs in August noted elevated Thyroid Stimulating Hormone, (id. 629) and low Free T4, (id. 630) consistent with a diagnosis of hypothyroidism, (id. 737).

On August 11, 2015 Plaintiff told Dr. Harris that she was in "constant pain," it was "[h]ard to get through [the] day," her "[h]eart and gut issues are the worst," she had "severe" chest pain with "[f]requent racing" of her heart, and she had "some incontinence" and "diarrhea and constipation." (Id. at 474.) On August 25, 2015 a stress echocardioam was completed, and Plaintiff developed fatigue, increased chest pain and dyspnea, and the test was terminated because of her symptoms. (Id. at 262.) That day, Dr. Harris wrote to Plaintiff's employer, "Tisha is current patient and undergoing treatment at our office. She is experiencing an increase in symptoms such as chronic pain, fatigue, neurologic issues, gastrointestinal issues and chest pain. Due to her condition, I advised her to remain out of work 1 year. Please take this into consideration. . . . If you have any questions, please feel free to contact us." (Id. at 468.)

On October 26, 2015 the vascular support surgeon, Dr. Zamzam, observed Plaintiff presented with "mild edema of the left leg" and wrote "there may be some type of systemic illness that is dominating her symptoms." (Id. at 252.) The same day Dr. Cheng noted she presented with neck pain, upper back pain, and right and left lower extremity pain, aggravated by activities, cold and damp weather, exercise, sitting, and walking. (Id. at 730.) He noted the pain prevented Plaintiff from walking more than a mile, sitting longer than a half hour, standing more than an hour, restricted her social life, and disturbed her sleep. (Id. at 731.) He wrote, "Please be advised that due to the amount of pain the patient has in her spine, she is disabled from the orthopedic spine point of view." (Id. at 503.)

**D. Initial Claim and Appeal**

On September 8, 2015, plaintiff contacted Standard by telephone to initiate a claim for disability benefits. (Id. at 815-29.) She identified her doctor as Dr. Harris, and reported that her disabling condition was Lyme disease "multi system failures" and that she was being treated by nine different doctors. (Id. at 766, 815, 826.) She noted she had a PICC line inserted and that Dr. Harris took her out of work for the 2015-2016 school year. (Id. at 826.) Plaintiff noted several symptoms preventing her from fulfilling occupational duties: inability to stand for longer periods at a stretch, incontinence ("not only my bladder") leading to embarrassing situations, PICC line slipping out of place, difficulty maintaining a schedule, and inadequate strength or stamina. (Id. at 150, 155.) Plaintiff's disability date according to her Employer's Statement was August 14, 2015. (Id. at 841-43 (noting the first full day of absence for asserted disability).)

Standard sent Dr. Harris an Attending Physician Statement ("APS") and received it completed on September 9, 2015. (AR at 865-66.) Dr. Harris noted a primary diagnosis of Lyme disease and a secondary diagnosis of Bartonella. (Id. at 865.) Other diagnoses included Babesia, Arthritis, Headaches, abdominal pain, diarrhea, nausea, and gastrointestinal issues. (Id. at 865.) He noted he recommended Entz stop working because she was "experiencing increased symptoms that affected her ability to work." (Id. at 866.) He stated Plaintiff's "physical,

mental, and cognitive limitations and work activity limitations," were "due to muscle and joint pain, headaches, gastrointestinal issue," and opined "she is unable to function at work. Needs to remain out." Id.

On October 16, 2015 Standard's Jill Reed interviewed Entz on the phone. (Id. at 20.) Entz explained that: she had suffered from various issues since childhood; they worsened as she got older; she received various diagnoses; and was given various treatments, without improvement. (Id.) She explained that she eventually learned about Lyme and chronic Lyme through her own research, was later diagnosed, and started treatment, though the treatment at times made her feel worse. (Id. at 19.) Reed asked Entz to provide the names of other physicians treating her and to forward test results and examinations discussed during the interview. (Id.)

A claim note dated October 23, 2015 states "review claim for denial." (Id. at 831.) Standard had not obtained medical records from providers other than Dr. Harris, and the list of medical providers arrived the same day. (Id. at 16, 766.) On October 26, 2015 records from Entz's other treating physicians were ordered, but only from June 1, 2014 to October 26, 2015. (Id. at 763-64.) Entz sent a letter update that was received by Standard on December 11, 2015. (Id. at 465-66.) She attached a history of her treatment and further medical records. (Id. at 467-568.)

The same day, Standard's Jon Cottrell performed a usual occupation review/vocational analysis. (Id. at 579-83.) He noted Entz's usual occupation is represented "by the DOT for Teacher, Elementary School ," a light duty occupation. (Id.) He noted the occupation required the ability to physically "exert 20 lbs. occasionally or 10 lbs. frequently, or negligible force constantly," as well as "significant standing, walking, and/or pulling." (Id. at 580.) He did not assess whether Entz could in fact perform these duties.

On December 31, 2015 Dr. Steven Beeson reviewed Entz's file. (Id. at 15-16.) He concluded Entz had "multiple somatic complaints" but "no diagnoses that establish any clear etiology." (Id.) He identified no evidence of an identifiable "disease process" limiting her work, other than her arthritic knee. (Id. at 16.)

On January 8, 2016 Standard's Jill Reed recommended that Entz's claim be denied. (Id. at 461.) On January 12, 2016, Standard issued a letter denying the claim for lack of evidence supporting that she could not perform her occupation, and quoting from Dr. Beeson's opinion. (Id. at 452-58.) The letter did not reference a contractual limitations provision but stated Entz could request review of the denial and file suit. (Id.)

Plaintiff appealed on July 1, 2016, with a submission of about 150 pages including a lengthy letter. (Id. at 149-299.) A standard employee summarized the claim in a memo dated July 25, 2016, and focused on Lyme disease, and noted an infectious disease specialist would review the file. (Id. at 133.) The employee later noted the opinions of Dr. Bradley Fancher regarding the diagnosis of Chronic Lyme Disease and controversy regarding treatment and testing of that condition. (Id. at 135.)

On September 1, 2016, the Standard employee referred Plaintiff's file to an outside vendor, MES Peer Review Services, for evaluation by an infectious disease specialist. (Id. at 127.) The referral asked the reviewing doctor to discuss accepted diagnosis and treatment of Lyme disease and to evaluate whether Entz's symptoms were supported by medical evidence or were consistent with any other condition. (Id. at 127-28.) Dr. John Brusch provided a detailed report dated September 14, 2016. (Id. at 104-126.)

On October 11, 2016, Standard issued a letter upholding denial of Plaintiff's claim for lack of supporting evidence that she was disabled from performing the material duties of her occupation. (Id. at 97.) Standard stated, "[M]edical evidence supports that you have a multitude of chronic complaints in the face of overwhelmingly normal physical test results. . . . From our review, we do not find that you have documented that you have a Sickness or Injury that would prevent this [sedentary to light] level of work." (Id. at 100-102.) The letter stated Standard "do[es] not agree you have given us enough medical evidence to support that you have a specific sickness or injury that has prevented you from working as a teacher" and argued "chronic Lyme disease is not an evidence based Sickness/Illness," which Standard does not accept as a valid diagnosis. (Id.)

## II. CONCLUSIONS OF LAW

### A. Standard of Review

Under ERISA, a beneficiary or plan participant may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2006). The Court reviews benefits denials de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits"; if the plan does grant such discretionary authority, the Court reviews the administrator's decision for abuse of discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Salomaa v. Honda Long Term Disability Plan, 637 F.3d 958, 965 (9th Cir. 2011). Here, the parties agree that the controlling standard of review is de novo. (Dkt. No. 45-1 ¶ 12; Dkt. No. 46 ¶ 75.)

A court employing de novo review in an ERISA case "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006). "[T]he court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Constr. Mgmt., 623 F.3d 1290, 1295-96 (9th Cir. 2010). Alternatively, when a claimant has been denied a full and fair review, the court has the discretion "to remand . . . so the claimant gets the benefit of a full and fair review." Schwartz v. Hartford Life & Accident Ins. Co., 2020 U.S. Dist. LEXIS 39581, at *14 (N.D. Cal. Mar. 6, 2020), citing Chuck v. Hewlett Packard Co., 455 F.3d 1026, 1035 (9th Cir. 2006).

In reviewing the Administrative Record, "the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010). Plaintiff bears the burden of showing, by a preponderance of the evidence, that she was disabled under the terms of the plan during the claim period. Eisner v. The Prudential Ins. Co. of Am., 10 F. Supp. 3d 1104, 1114 (N.D. Cal. 2014).

**B. Discussion**

As the Court is applying de novo review, no deference is given to the claim administrator's decision, and the Court merely evaluates the persuasiveness of each side's case and determines if Plaintiff has adequately established that she is disabled under the Plan. First, the Court determines that Plaintiff timely commenced the action. The Court then weighs whether to consider extrinsic evidence, and finds it necessary to consider the California State Teachers' Retirement System's ("CalSTRS") decision that Plaintiff was entitled to disability retirement benefits. The Court moves on to find Plaintiff has established she was more likely than not disabled under the Plan's definition, and that Standard improperly focused only narrowly on her asserted chronic Lyme disease, instead of assessing whether her symptoms rendered her functionally disabled. The Court concludes by considering the value of the LTD benefits denied.

    1. **Timeliness**

The parties disagree whether the suit is timely. The Plan includes a three-year limitation period starting from the "time proof of loss is required to be furnished." (AR at 1112, 16.) Both the Plan and California law provide substantially the same proof of loss deadlines. Proof of loss is due 90 days after the date of loss, except if the claim is for periodic payments contingent on continuing loss, in which case proof of loss is due 90 days after the period the provider is liable. (AR at 1112, 16.) Cal. Ins. Code § 10350.7.[3]

The Court follows a similar case from this District and concludes that in cases of asserted ongoing disability, the applicable proof of loss deadline is 90 days after the end of the period for which the provider is allegedly liable. Gray v. United of Omaha Life Ins. Co., 251 F. Supp. 3d 1317, 1324 (C.D. Cal. 2017). Here, Plaintiff claimed a long term and continuing disability for which she would be entitled to a period of two years of benefits—the maximum period of liability for disability benefits under the Plan. (AR at 1094.) Calculating from Defendant's proposed onset of disability date, August 14, 2015, (Def.'s Reply at 11; AR at 841-43 (noting the first full day of absence for asserted disability)), the applicable proof of loss deadline is two years and 90 days later, or November 12, 2017. The contractual limitations period ends three years after that,

---

[3] "Written proof of loss must be furnished to the insurer . . . in case of claim for loss for which this policy provides any periodic payment contingent upon continuing loss <u>within 90 days after the termination of the period for which the insurer is liable</u> and in case of claim for any other loss within 90 days after the date of such loss." Cal. Ins. Code § 10350.7 (emphasis added).

or November 12, 2020.  Because Plaintiff commenced the action in March of 2019, the action is timely.[4]

In the alternative, the Court agrees with Plaintiff that failure to notify a claimant of the applicable limitation period constitutes a breach of fiduciary duty precluding reliance upon the limitation period.  (Pl.'s Br. at 15.)  Mogck v. Unum Life Ins. Co. of Am., 292 F.3d 1025, 1028 (9th Cir. 2002) (concluding that given the failure of the provider to use appropriate language requesting proof of loss by a particular deadline, the contractual time limitation is not triggered). National Farmers Union Prop. and Cas. Co. v. Colbrese, 368 F.2d 405, 410–11 (9th Cir.1966) ("A fundamental principle of insurance law is that a policy is to be construed liberally in favor of the insured and strictly against the insurer, who normally is responsible for the language it contains.")  Here, Standard neglected to mention any contractual limitations period in its letters to Plaintiff, and should not be permitted to invoke it now as a bar to her claims.

### 2. Evidence Outside the Record

Plaintiff asks that the Court clarify the record and/or consider extrinsic evidence, including: (1) letters from CalSTRS awarding disability retirement benefits (Entz Decl., Exs. 3-5); (2) evidence regarding Dr. Brusch; (3) evidence demonstrating the value of the denied benefits; (4) evidence to establish the claim for surcharge/interest which is not limited to the AR.  (Pl.'s Br. at 13.)  The Court considers the first and third categories of evidence, but not the second and fourth.

"When a district court reviews an ERISA administrator's denial of benefits under the de novo standard of review, 'extrinsic evidence [may] be considered only under certain limited circumstances.'"  Nagay v. Grp. Long Term Disability Plan for Employees of Oracle Am., Inc., et al., aff'd, 739 F. App'x 366 (9th Cir. 2018).  A district court "exercise[s] its discretion to consider evidence outside the administrative record only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision."  Opeta v. Nw. Airlines Pension Plan for Contract Employees, 484 F.3d 1211, 1217 (9th Cir. 2007) (citation and quotation marks omitted).

In Opeta, the Ninth Circuit quoted the Fourth Circuit, which formulated a non-exhaustive list of exceptional circumstances justifying the introduction of extrinsic evidence:

---

[4] Defendant argues vaguely that accepting a rule that the proof of loss is not due until 90 days after the termination of a years-long period would "cause chaos" or an "administrative nightmare."  (Def.'s Reply at 15.)  The Court disagrees.  As the court in Gray observed, "despite the hypothetical negative policy implications of the majority approach, there appear to be few, if any, cases in which a claimant has delayed so long in filing an administrative claim as to make the limitations period absurd," and there is "little incentive to delay purposely in bringing a claim." Gray v. United of Omaha Life Ins. Co., 251 F. Supp. 3d 1317, 1326-27 (C.D. Cal. 2017).

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

Id. Even if several of these circumstances are present, a court must still find that these circumstances require consideration of the extrinsic evidence to conduct a de novo review of the benefits decision. Id.

As in Nagay, a case involving a plaintiff with chronic fatigue syndrome, Plaintiff here claims to have a complicated medical condition (post Lyme or chronic Lyme disease). Nagay, 183 F. Supp. 3d at 1025. The Nagay court wrote, "Further, the SSA Decision is necessary to conduct an adequate de novo review of Nagay's claims. [Chronic fatigue syndrome] is a complicated medical condition, for which there are no objective tests and for which a diagnosis depends in large part on the patient's self-reported symptoms." Id. (citation omitted). In such cases, courts confront "an unavoidable [credibility] dispute between the ERISA beneficiary and his treating physicians on one hand, and the insurer's medical experts on the other . . . ." Id.

The case at bar presents similar challenges, because Standard contends that mainstream medicine does not recognize chronic Lyme disease and that subjective self-reported symptoms cannot establish disability on this basis. Plaintiff meanwhile notes that the CDC recognizes conditions called "late-Lyme disease" and "post-treatment Lyme disease syndrome" that can cause symptoms similar to Plaintiff's for extended periods. (Dkt. No. 46 ¶ 116; Pl.'s Reply at 4-5.) Testing limitations complicate matters further, because the tests measure antibodies and not the organism itself; thus Lyme is difficult to detect. (Id.) Due to these testing limitations, doctors must also consider a patient's symptoms and history in diagnosing Lyme disease. (Id.) Common Lyme symptoms can also be caused by other conditions which Plaintiff has been diagnosed with, such as HHV-6 (which may cause diathermia and rash as well as chronic fatigue) and Lupus Anticoagulant (persistent leg pain and edema). (Id. at 5-6; AR at 14-16, 257, 291, 498, 740-42.)

Although the CalSTRS benefits decision is not binding, the Court will consider it in determining whether Plaintiff was "Totally Disabled." See Nagay, 183 F. Supp. 3d at 1025 (citing Schramm v. CNA Fin Corp. Insured Grp. Ben Program, 718 F. Supp. 2d 1151, 1165 (N.D. Cal. 2010) (considering extrinsic award of Social Security Disability Insurance benefits); Oldoerp v. Wells Fargo & Co. Long Term Disability Plan, 2013 WL 6000587, at *3 (N.D. Cal. Nov. 12, 2013) (same)).

The Court considers the evidence submitted by the parties regarding the value of the benefits. Given the debate between Plaintiff and Defendant regarding the correct Regular

Contract Salary and the relative paucity of information on this subject in the record, the circumstances establish that additional evidence is necessary for the Court to evaluate the parties' contentions and to ascertain the value of the benefit owed. Consideration of the other categories of evidence advanced by Plaintiff is not necessary to prove disability, however.

### 3. Denial of Benefits

Considering the evidence, the Court finds Plaintiff has carried her burden of establishing that she was "totally disabled" as of August 14, 2015. Standard's main argument is that Dr. Harris's diagnosis of Lyme or "chronic" Lyme disease is medically questionable. However, this red herring has little bearing on whether or not Plaintiff could with "reasonable continuity" perform her "Usual Occupation" with her panoply of symptoms. (AR at 917, 1097.)

Standard's review of Plaintiff's claim—initially and on appeal—focused narrowly on discrediting Dr. Harris as a quack, and casting doubt on Plaintiff's reports that she had Lyme disease. Standard gave little consideration, if any, to the severity of Plaintiff's symptoms in the context of her full medical history. Instead, Jon Cottrell's description of Plaintiff's occupation was untethered to the evidence presented, and he failed to evaluate whether Plaintiff could in fact perform any of the indicated occupational duties. Similarly, Standard's Dr. Beeson admitted Plaintiff had extensive somatic complaints, and then reached a narrow conclusion: the manner of causation of these symptoms was unclear. (AR at 15-16.) He stated no "objective identifiable disease process" limited her work, (id. at 16), but did not credibly opine on whether she could "with reasonable continuity" perform the "Substantial and Material Acts" necessary to being an elementary school teacher.

The Court gives greater weight to the opinions of Plaintiff's multiple treating physicians, each of whom witnessed and assessed her condition over a significant period of time. Standard urges the Court to question Plaintiff's and Dr. Harris's credibility, but it is unclear why the Court should discount the opinions of Dr. Siddighi, (AR at 522, 27), Dr. Rizkalla, (id. at 747), and especially Dr. Cheng, (id. at 503, 57, 730-31). A district court "may, in conducting its independent evaluation of the evidence in the administrative record [on de novo review] take cognizance of the fact . . . that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator." Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Protection Plan, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003). "[R]easoned assessments of what Plaintiff can and cannot do are given greater weight than mere statements of medical diagnoses." Brown v. Unum Life Ins. Co. of Am., 356 F. Supp. 3d 949, 964 (C.D. Cal. 2019) (citations omitted). Descriptions of symptomology are likewise more helpful in determining Plaintiff's functional capacity than are mere diagnoses. Id.

Plaintiff's treating physicians had several opportunities to meet and observe Plaintiff holistically, whereas the reviews conducted by Standard were focused narrowly on whether or not there was a test in time to establish Lyme. Standard's doctors did not say much about Plaintiff's ability to perform the acts necessary to carry out her usual occupation with reasonable continuity. Disability should have been measured by Plaintiff's functional capacity, given her

symptoms, compared to her duties as a teacher. In contrast, Plaintiff's primary treating physicians opined more often and more directly on her inability to work in any capacity. They relied on both their objective observations of Plaintiff's comfort level as well as her own subjective reports:

- On August 25, 2015, Dr. Steven Harris wrote: "Tisha. . . is experiencing an increase in symptoms such as chronic pain, fatigue, neurologic issues, gastrointestinal issues and chest pain. Due to her condition, I advised her to remain out of work 1 year. . ." (AR at 468.)

- Subsequently, in a September 8, 2016 APS form completed by Dr. Harris at Standard's request, he wrote "due to muscle [and] joint pain, headaches, gastrointestinal issues, she is unable to function at work." (Id. at 866.)

- On October 26, 2015, (id. at 730-32), Dr. Wayne K. Cheng noted that Entz presented with neck pain, upper back pain, and right and left lower extremity pain, aggravated by activities, cold and damp weather, exercise, sitting, and walking. He further noted that pain prevented Entz from walking more than 1 mile, sitting more than ½ hour, or standing more than 1 hour, restricted Entz's social life, and occasionally disturbed sleep. (Id. at 731.) Spondylosis without myelopathy or radiculopathy of the cervical region, and other invertebral disc degeneration of the thoracic region were diagnosed. (Id.) A second opinion was suggested for mid thoracic pain. (Id.) The same day, Dr. Cheng wrote a letter dated October 26, 2015 in support of Entz's claim, noting: "Please be advised that due to the amount of pain the patient has in her spine, she is disabled from an orthopedic spine point of view." (Id. at 503.)

- By letter dated November 11, 2015, Dr. Sam Siddighi, wrote, "It is my medical opinion that Tisha Entz has chronic pain and frequent urination, affecting her ability to work." (Id. at 522.)

The Court gives significant weight to this varied evidence from treating physicians who observed Plaintiff in person on multiple occasions.

The Court also finds persuasive the CalSTRS finding that Plaintiff was disabled, effective February 3, 2016. (Entz Decl., Exs. 3-5.) The Ninth Circuit has explained that evidence of a Social Security disability award ("SSA") is "of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary." Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 679 (9th Cir. 2011). Here, Entz informed Standard in her appeal letter she had been awarded CalSTRS benefits but Standard chose not to consider the significance of the award. (AR at 150.) While the de novo standard of review applies in this case, the Court treats the CalSTRS decision as roughly analogous to an SSA decision, which has been deemed "weighty evidence" of disability. See id. The CalSTRS finding is significant, because the definition of disability in that context is more stringent than that in the Plan. CalSTRS

requires a "medically determinable" impairment, whereas the "Total Disability" under the Plan does not by its terms require this level of proof. Cal. Educ. Code § 22126.

In response to this evidence, Standard highlights the many normal test results in Plaintiff's medical file, (Def.'s Br. at 3, 16), but ignores that the tests were done to rule out other illnesses. The tests bear only on potential causes of Plaintiff's symptoms, but do not disprove the existence of the reported symptoms themselves. Nor do the tests bear on Plaintiff's ability to perform occupational duties. The Plan does not require objective proof, and contemplates disability even where the causes of a sickness are unknown.[5] (Pl.'s Reply at 9.) Unlike other policies written by Standard, the Plan does not permit Standard to "require proof of physical impairment that results from anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." (Id.) Nelson v. Standard Ins. Co., 2016 U.S. Dist. LEXIS 4940, at *21 (S.D. Cal. Jan. 13, 2016). Even assuming objective evidence of a disease is required, Standard never considered the significance of Plaintiff's positive test results for HHV-6 and lupus anticoagulant, conditions that could also be causing her symptoms.

### 4. Value of the Denied LTD and Remedy

A person who meets all of the Policy's terms and conditions will be entitled to benefits. (AR at 1093.) Otherwise payable benefits under the Policy are reduced by Deductible Income, including the amount of "disability or retirement benefits you receive or are eligible to receive because of your Disability or retirement under . . . a state teacher retirement system . . . ." (Id. at 1102.) Benefits are calculated from the employee's Regular Contract Salary as of the date of onset of disability, and "will not change after your date of disability." (Id. at 1101.) Regular Contract Salary means "your annual salary from the Employer under the terms of your employment contract with the Employer in effect for the contract year in which you become Disabled." (Id. at 1100.) "Deductible Income" has a complex definition, but includes the amount of "disability or retirement benefits you receive or are eligible to receive because of your Disability or retirement under . . .a state teacher retirement system . . . ." (Id. at 1102.)

Plaintiff asserts that the value of her LTD benefits through the 24-month maximum benefit period is $57,350.36. (Pl.'s Br. at 24.) Defendant argues the correct figure is $51,511.73. (Def.'s Br. at 12; Flanigan Decl., ¶ 7.) Maddeningly, neither party provides the formula by which they arrive at these figures and both appear to be deducting large sums of unspecified income. Nevertheless, the Court possesses enough information to agree with Defendant's calculation. Entz's employer reported her Regular Contract Salary at the start of disability as $98,217.00,

---

[5] The Ninth Circuit has observed individual reactions to pain are subjective and not easily determined by reference to objective measurements. Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872 (9th Cir. 2008). Benefits should not be denied for failure to provide "evidence that simply is not available." Id.

which is the salary Defendant uses.[6] (AR at 843; Entz Dec. ¶ 6; Flanigan Decl. (providing background on Standard's calculation).) The parties also debate whether Plaintiff's Cal-STRS payments should be deducted. Plaintiff argues that "the proper offset is what is received" from Cal-STRS, then proceeds to omit what amount, exactly, she received from Cal-STRS disability. (Pl.'s Reply at 24.) Accordingly, Plaintiff has not rebutted Defendant's claim that she received the modified disability retirement benefit of $3,421.67, (Id.; Hull Decl., Ex. A), and has not made a coherent argument that this amount cannot be deducted under the clear terms of the Plan. The Court therefore adopts Standard's proposed figure: $51,511.73 in owed LTD benefits.

Plaintiff requests a combined 5% prejudgment interest and surcharge based on the loss from the fiduciary's breach of duty and her resulting harm. (Pl.'s Reply at 21-22.) If a plan participant recovers benefits due under ERISA, it is within the court's discretion to also award prejudgment interest. 29 U.S.C. § 1132(a)(1)(B); Shaw v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan, 750 F.2d 1458, 1465 (9th Cir. 1985). In addition, the Supreme Court has determined surcharge is one of three forms of equitable relief available under § 1132(a)(3). Gabriel v. Alaska Elec. Pension Fund, 773 F.3d 945, 957 (9th Cir. 2014); Guenther v. Lockheed Martin Corp., 646 F. App'x 567, 568 (9th Cir. 2016) (citation omitted); Skinner v. Northrop Grumman Ret. Plan B, 673 F.3d 1162, 1167 (9th Cir. 2012) (applying traditional equitable principles to determine whether "the remedy of surcharge could hold the [plan administrator] liable for benefits it gained through unjust enrichment or for harm caused as the result of its breach").

Here, Plaintiff states the denial of LTD benefits caused her to resort to high interest credit cards and to borrow money against her life insurance at the rate of 5%. (Entz Decl. ¶ 20, Ex. 7.) Plaintiff requests an award of $10,930.59 as either an award of surcharge or prejudgment interest on past due benefits. Despite its best efforts, the Court cannot ascertain how Plaintiff arrives at this figure, even after examining her declaration and attached exhibits. It is not clear, for example, what dates Plaintiff used, if the interest paid also resulted from pre-existing loans,[7] when exactly Plaintiff took out the loan, or how often interest is compounded on that loan. As a result, Plaintiff has not established actual harm, and the Court finds that an equitable remedy is not warranted.

---

[6] Although Plaintiff's union negotiated a pay raise retroactive to July 1, 2015 in May 2016, the pay raise was not in effect on the date of disability. The Policy is clear that benefits are calculated as of the date of onset of disability, and "will not change after your date of disability." (AR at 1101.) Similarly, the contract salary is the annual salary "in effect for the contract year in which you became disabled," which in Plaintiff's case was 2015. (AR at 1100.) The pay raise was not put into effect (retroactively) until it was negotiated in 2016, and so cannot apply.

[7] For example, some of the Exhibits appear to include loans processed and interest assessed going back to 2009, but Plaintiff's last day at work was in June 2015. As a result, the Court has difficulty ascertaining what financial harm resulted specifically from the denial of benefits in this case. CIGNA Corp. v. Amara, 563 U.S. 421, 444 (2011) (noting a "fiduciary can be surcharged . . . only upon a showing of actual harm—proved (under the default rule for civil cases) by a preponderance of the evidence.").

## III.  CONCLUSION

Based on its findings of fact and conclusions of law, the Court concludes that Plaintiff has adequately established she was "totally disabled" under the terms of the Plan for the 24-month period.  Accordingly, the Court REVERSES Standard's decision to deny Plaintiff's LTD benefits for the 24-month period and AWARDS Plaintiff **$51,511.73** in disability benefits owed.

**IT IS SO ORDERED.**